Jonathan D. Miller (Bar No. 220848)
jonathan@nps-law.com
Alison M. Bernal (Bar No. 264629)
alison@nps-law.com
NYE, PEABODY, STIRLING, HALE &
MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, California 93101
Telephone: (805) 963-2345
Facsimile: (805) 563-5385

Attorneys for Plaintiff, ROBERT PERRY

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT PERRY, an individual,<br><br>Plaintiff,<br><br>v.<br><br>JABIRU AIRCRAFT PTY. LTD., an Australian corporation; JABIRU NORTH AMERICA, a Tennessee limited liability company; JABIRU U.S.A. SPORT AIRCRAFT, a Tennessee limited liability company; and DOES 1-10, inclusive,<br><br>Defendants. | CASE NO.: 2:17-CV-08356<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1. **VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT, Civil Code §1750, et seq.;**<br>2. **VIOLATION OF THE UNLAWFUL PRONG OF CALIFORNIA'S UNFAIR COMPETITION LAW;**<br>3. **VIOLATION OF THE UNFAIR PRONG OF CALIFORNIA'S UNFAIR COMPETITION LAW;**<br>4. **VIOLATION OF THE FRAUDULENT PRONG OF CALIFORNIA'S UNFAIR COMPETITION LAW;**<br>5. **VIOLATION OF CALIFORNIA'S FAIR ADVERTISING LAW;**<br>6. **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY;**<br>7. **COMMON LAW FRAUD; and**<br>8. **STRICT PRODUCT LIABILITY**<br><br>**JURY TRIAL DEMANDED**<br><br>TRIAL DATE: None set |

1

FIRST AMENDED COMPLAINT

Plaintiff ROBERT PERRY brings this lawsuit against Jabiru Aircraft Pty, Ltd., and its North American distributors, Jabiru N.A. (formerly Jabiru U.S.A. Sport Aircraft), by and through his attorneys, and alleges as follows:

## INTRODUCTION

1. This lawsuit is brought by Plaintiff, who purchased a Jabiru engine for his light sport aircraft, which engine was defective and failed during a flight, requiring Plaintiff to make an emergency landing in his aircraft and in doing so experience a close encounter with death or serious injury.

2. This action arises from Defendants' marketing, manufacturing, and sale of defective aircraft engines to Plaintiff. Defendants represented to Plaintiff that the engines are safe, usable engines and were backed with a limited warranty when in fact they contain a defect that results in premature failure of engine components and ultimately engine failure.

3. On July 10, 2017, Plaintiff sent a demand letter describing the claims in this complaint to Defendants, as required under the Consumer Legal Remedies Act, Cal. Civ. Code § 1782.

4. Defendants failed to respond to Plaintiff's July 10, 2017, letter.

## JURISDICTION

5. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and the action is between citizens of different states and a foreign citizen. The Court has personal jurisdiction over the parties, all of whom reside in the State of California or have had sufficient contacts with the State to justify jurisdiction.

6. Venue is appropriate in this Court because Plaintiff is located in Santa Barbara County, and Defendants do business in this judicial district. Moreover, the incident from which this action arises occurred in the County of Santa Barbara, within this judicial district. Additionally, Defendants have advertised in this district and have received substantial revenue and profits from their sales of engines in this

district; therefore, a substantial part of the events and omissions giving rise to the claims occurred, in part, in this district.

# PARTIES

**I.   Plaintiff**

7. Plaintiff Robert Perry is a resident of, and is domiciled in, California, with his permanent residence in Buellton, California, in Santa Barbara County.

8. In October 2016, Plaintiff purchased a Jabiru 3300 engine SN 33A2374. He did so in reliance on Jabiru's representations that he was receiving a safe, usable engine. However, in March 2017, with less than 377 hours of flight time on the engine since purchased new, the engine experienced catastrophic failure forcing Plaintiff to make an emergency landing of his aircraft. When Plaintiff inspected the engine, failed and defective parts were immediately apparent within - namely the collet had improperly seated with the spring causing a valve to enter and destroy a piston and cylinder: the engine would need to be replaced.

9. Plaintiff had performed all things agreed to or required under the warranty, and maintained the engine immaculately. However, Jabiru refused to honor the warranty on the engine or otherwise remedy the matter.

10. Plaintiff has suffered an ascertainable loss as a result of Defendant's omissions and misrepresentations associated with the Defect, including but not limited to out of pocket loss associated with the repair of the Defect as well as the diminished value of his aircraft occasioned by the Defect, and the emotional distress caused by a near-fatal emergency landing following engine failure.

11. Neither Jabiru nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the Defect or defective engine design, manufacture, or materials prior to purchase. Similarly, despite efforts to get Jabiru to accept responsibility following manifestation of the Defect in Plaintiff's engine, Jabiru has continued to deny the existence of a Defect and to actively conceal its existence.

## II.   Defendants

12.   Defendant Jabiru Aircraft Pty Ltd., is a wholesale aircraft engine distributor. Upon information and belief, Jabiru designs, develops, manufactures, distributes, markets, sells, leases, warrants, services, and repairs aircraft engines, including Plaintiff's engine.

13.   Jabiru is an Australian company. It is incorporated and headquartered in Queensland, Australia, with its principal place of business at P.O. Box 5792, Bundaberg West, QLD 4670, Australia. Jabiru manufactures and distributes Jabiru engines and sells them throughout the United States through its licensed North American distributors.

14.   Jabiru North America ("Jabiru N.A.") is a Tennessee company. It is a licensed seller and servicer of Jabiru engines. Jabiru N.A. is incorporated and headquartered in Tennessee, with its principal place of business at 2842 Highway 231 N, Shelbyville, TN, 37160. Upon information and belief, Jabiru N.A. was formed on 2016. Its predecessor, Jabiru U.S.A. Sports Aircraft, which is a now-defunct limited liability company, sold the engine at issue in this case. Jabiru U.S.A. Sports Aircraft, like Jabiru N.A., is a Tennessee company headquartered in, and with its principal place of business in, Shelbyville, Tennessee. Upon information and belief, in January 2016, Jabiru U.S.A. Sports Aircraft split into two companies – Jabiru N.A., which sells the Jabiru engines, and Sport Aircraft Services, which services the engines. Jabiru N.A. markets itself as the sole Jabiru distributor in North America.

## TOLLING AND STATUTES OF LIMITATIONS

15.   Any applicable statues of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff could not have reasonably discovered the true, latent defective nature of the Defect until shortly before this litigation was commenced.

16.   Defendants were and remain under a continuing duty to disclose to

4

1 Plaintiff the true character, quality, and nature of the Engine; that this Defect is
2 based on a poor design, substandard materials, or material defects; and that it will
3 require costly repairs, poses a safety concern, and diminishes the resale value of the
4 Engine. As a result of the active concealment by Defendants, any and all applicable
5 statutes of limitations have been tolled.

## FACTUAL ALLEGATIONS

17. Plaintiff is an expert pilot. He has been flying for nearly 40 years and holds an FAA approved certificate "Repairman Light Sport Aircraft" for the specific airframe he was flying at the time of the crash. Plaintiff has engine logs and airframe logs to show he has properly maintained all parts.

18. The engine in Plaintiff's aircraft at the time of his crash was a Jabiru 3300 engine SN 33A2374. The airframe was built in Tennessee and was number 133 off the assembly line. Arion Aircraft built the aircraft around a Jabiru engine. The engine's birthdate was September 29, 2011. From September 29, 2011, through October 14, 2011, the owner of the engine is listed as Arion Aircraft. On October 14, 2011, Gary Barnett purchased the engine from the predecessor of Jabiru, N.A.

19. Mr. Barnett is an aeronautical engineer. He lives in Oregon. He maintained the aircraft in excellent condition, and has all maintenance records to show the maintenance performed. Mr. Barnett logged approximately 322 hours on the aircraft before he sold it to Plaintiff. Mr. Barnett is a fastidious and well-educated pilot who operated the aircraft in favorable conditions.

20. In October 2016, Mr. Barnett sold his aircraft to Plaintiff. Plaintiff purchased the aircraft based on representations from Defendants that the Jabiru engine was safe and reliable.

21. On March 13, 2017, at approximately 10:45 a.m., Plaintiff was piloting his Arion Lightning LS-1 powered by a Jabiru 3300 engine SN 33A2374 on a VFR flight when he experienced engine failure. Plaintiff had only operated the engine for about 55 hours since it was purchased in October 2016.

22. On the March 13th flight, Plaintiff departed Santa Ynez Valley Airport, California (KIZA) at about 10:30 a.m. for Camarillo, California (KCMA). He had performed a routine preflight check. He did not find any anomalies with the aircraft and his oil level was at an appropriate place within the markings on the dipstick.

23. Plaintiff's route was direct and he climbed to his cruise altitude of 5,500ft MSL under clear skies and smooth air. Engine temps (EGT, CHT, Oil Temp/press) were all normal and within ranges that he had noted on all previous flights.

24. On the climb out, Plaintiff contacted Santa Barbara Approach on 125.4 and received a transponder code and requested flight following en route. They replied, "radar contact" and Plaintiff continued eastbound past San Marcos VOR. Plaintiff had engaged the autopilot and was monitoring engine gauges about 10 minutes into the flight when without warning the engine went from smooth operation at 2,850 RPM (normal cruise) to very rough.

25. Plaintiff immediately put his hands on the stick and throttle, disconnected the autopilot, scanned the instruments, applied carb heat, put the fuel pump on, switched the fuel tanks off, and began slowing the aircraft to best rate of glide. Plaintiff turned left for more than 180 degrees to head directly to KSBA about 10 miles west of his position. During the turn, Plaintiff communicated his distress to approach as "Pan, Pan, Pan" and informed KSBA of a "problem" and that he was heading directly for KSBA.

26. Although Plaintiff had experienced engine failures two other times in his flying career, they were both during the testing of small experimental aircraft that happened seconds after takeoff over the runway, and were unmistakable losses of power. This, however, felt very different in that after reducing power to lessen the shaking to 2,000 RPM, Plaintiff still had some engine power. Plaintiff believed he had lost a cylinder and the power loss was not fuel or ignition related.

27. Plaintiff continued towards KSBA in short order, identifying the runway

6

complex near the fog bank just offshore and nearby. Plaintiff maintained his best glide speed while monitoring engine temps and EGT. Plaintiff noted one cylinder was much colder than the others, reinforcing his belief that he had somehow lost one of the six cylinders.

28. Plaintiff arrived in the airport area with sufficient altitude to have choices regarding which runway to use. Winds reported by the tower were 120 @ 4 KTS variable to calm. Plaintiff did two "S" turns and lost sufficient altitude to be in a good position to make a normal downwind to runway 15L. Plaintiff informed the tower that he was downwind for 15L and they acknowledged with information and that 15R was closed. Plaintiff acknowledged and shortly after he reduced power the engine abruptly came to a stop.

29. Plaintiff informed tower that he was "engine out" and then turned towards runway 15L sufficiently to allow substantial room to maneuver. Plaintiff crossed the numbers a bit faster than needed and landed about halfway down the runway with sufficient momentum to clear the runway and roll onto the ramp at the southeast side of the airport near Atlantic Aviation.

30. While Plaintiff was badly shaken and traumatized by the incident, he miraculously landed the aircraft without physical injury to himself or others. The audio transmissions were recorded by ATCLive.net. A third party used the audio and photographs of Plaintiff's aircraft to create a reenactment of the incident which can be viewed at https://www.youtube.com/watch?v=rDNxp5zLQRA. This displays not only the defect in this case, but the expert piloting by Plaintiff which prevented a major catastrophe.

31. The following day, Plaintiff moved the aircraft into a t-hangar at KSBA and removed the cowl to inspect the engine for damage. Upon removing the spark plugs from the number 5 cylinder, one was found to have zero gap and the second spark plug was destroyed, both of which are confirmed by photographs.

32. Two days later, Plaintiff returned to the aircraft with Jim Nichols, an

7

experienced A&P mechanic with IA authority. They consulted with Pete Krotje of Jabiru North America and he indicated removal of the cylinder was the appropriate course of action. Upon removal of the valve cover it was immediately apparent that the collet and retainer from the intake valve on the number 5 cylinder had been destroyed. The outside rim of the collet was found around the rocker arm and the inner part had fallen down the column formed by the spring. There was no evidence of a valve stem. The two keeper halves were found at the bottom of the head inside the covers. They then removed the exhaust system, shaking it to see if any pieces of debris were contained within; none were found. There was, however, substantial evidence of pounding by the valve end on the head end of the induction tube as well as inside the head.

33.   As Plaintiff and Mr. Nichols pulled the head off, they immediately saw extreme damage to the piston and valves. There were two large holes in the piston head, one shaped exactly like the valve and a second about the size and shape of the valve stem. The holes extended through the piston. The intake valve was wedged sideways in the intake and beaten and misshapen. The exhaust valve was displaced from its normal place in the seat and had damage on the surface. The top of the cylinder head was scarred and marked by the parts moving within. The intake and exhaust pushrods were bent substantially.

34.   Inspection of the intake valve spring, collet, head, valve, and pushrods by Mr. Nichols, Don Stratman (a locally noted aircraft mechanical expert), and Stan Peternel (another Jabiru engine owner with substantial aircraft engine experience) all concluded the failure was most likely the collet in improperly seating with the spring. Evidence of sharp edges and wearing of the top of the intake valve spring is indicative of a defective and poorly designed part.

35.   These defects were known to Jabiru. Jabiru Service Letter 008-1, issued on December 21, 2012, addresses this issue and indicates that a heavier duty collet (2.0 mm from the 1.5 mm original) was required to fix the defect. However, JSB

008-1 indicated that the engines affected were operated in dusty conditions and were operated infrequently. Jabiru issued this service letter only a year after this aircraft was put into service by Arion Aircraft, the manufacturer.

36. Plaintiff's engine was operated for the first 322 hours in the highlands of central Oregon, a decidedly non-dusty area and for the past six months and 55 hours on the central California coastal area of vineyards and coastal oaks, another non-dusty area. The aircraft had been flown weekly if not more often for the past six months and had shown no operational problems. All maintenance was fastidiously performed by the former owner (a retired aerospace engineer) and well documented. Plaintiff had continued to perform regular maintenance on the aircraft and engine checking torque on all necessary head bolts, exhaust and intake bolts, and visually inspecting under the rocker covers at each 25-hour oil change that has been performed over the past 55 hours of flying.

37. Prior to the incident caused by the defect, the engine had performed well in the past six months with all engine temperatures in the nominal ranges and never having a high temperature problem with the CHT's, EGT's, or oil temps.

38. Plaintiff has been a pilot for 40 years, and monitors his engine instrument incessantly during every flight. Plaintiff is aware if there are any changes, even if it is only because it is a warmer or colder day. Plaintiff's aircraft is always hangared when at home. It has only been outside for a few days of its entire life in California or in Oregon. There is no explanation for why this well-maintained engine should have had this catastrophic failure with only 377 hours since new.

39. These facts show not only that the engine was defective, but that Jabiru knew of the issue, did not alert its customers, and continued to market the engine as safe and reliable, when the opposite is true.

40. Upon information and belief, the Australian government issued a report on the reliability of the engine, which Jabiru claimed had been withdrawn. Yet the

defect giving rise to Plaintiff's catastrophic engine failure was the same as that detailed in the government's report. Plaintiff only discovered this report, which Jabiru expressly refuted, after the incident caused by the defective engine.

# CAUSES OF ACTION
## FIRST CAUSE OF ACTION
**Violations of California's Consumer Legal Remedies Act ("CLRA") (Cal. Civ. Code § 1750,** *et seq.***)**

41. Plaintiff incorporates by reference each preceding and succeeding paragraph as if fully set forth herein.

42. Under the CLRA, "goods" mean "tangible chattels bought or leased for use primarily for personal, family, or household purposes." CIV. CODE § 1761(a).

43. The Engines are "goods" under Civil Code section 1761(a).

44. Under the CLRA, "consumer" means "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." *Id*. § 1761(d).

45. Plaintiff is a "consumer" under Civil Code section 1761(d).

46. Under the CLRA, "person" means "an individual, partnership, corporation, limited liability company, association, or other group, however organized." *Id*. § 1761(c).

47. Defendants are "persons" under Civil Code section 1761(c).

48. Under the CLRA, "transaction" means "an agreement between a consumer and another person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement." *Id*. § 1761(e).

49. Defendants, on one hand, and Plaintiff, on the other hand, engaged in "transactions" as the CLRA defines that term because, among other reasons, Defendant agreed to manufacture, distribute, and sell, and pursuant to that

agreement sold, Engines to Plaintiff and other consumers.

50. Defendants' actions, representations, and conduct violated, and continue to violate, the CLRA because they extend to transactions that are intended to result, or that have resulted, in the sale of goods to consumers.

51. Under section 1770(a) of the CLRA:

(a) The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:

\* \* \*

(2) Misrepresenting the source, sponsorship, approval, or certification of goods or services;

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;

\* \* \*

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

\* \* \*

(9) Advertising goods or services with intent not to sell them as advertised;

\* \* \*

(16) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

*Id.* § 1770(a).

52. As alleged above, Defendants violated, and continue to violate, Civil Code section 1770(a)(5) by representing the Engines have characteristics, uses, benefits, and qualities which they do not. Specifically, Defendants represent the Engines are safe, usable, and defect-free when in fact they contain a Defect that

causes engine components to fail prematurely.

53. Further, as alleged above, Defendants violated, and continue to violate, Civil Code section 1770(a)(7) by representing the Engines have characteristics, uses, benefits, and qualities which they do not. Specifically, Defendants represent the Engines are safe, usable, and defect-free when in fact they contain a Defect that causes engine components to fail prematurely.

54. Further, as alleged above, Defendants violated, and continue to violate, Civil Code section 1770(a)(9) by representing the Engines as safe, usable, and defect-free with the intent to sell Engines that contain a Defect causing premature engine failure.

55. Finally, as alleged above, Defendants violated, and continue to violate, Civil Code section 1770(a)(16) by representing the Engines they manufactured and sold to Plaintiff and other consumers as safe, usable, and defect-free when in fact they contain a Defect that causes engine components to fail prematurely.

56. Defendants violate the CLRA by representing through their marketing that the Engine is safe, usable, and defect-free, as described above, when they know or should know that the representations are unsubstantiated, false, and misleading.

57. Plaintiff believed Defendants' representations that the Engine is safe, usable, and defect-free, and would not have purchased it but for Defendants' misleading statements. Had Plaintiff known of the defect, he would have never purchased the aircraft with the engine.

58. Plaintiff is injured in fact and lost, and continues to lose, money as a result of Defendants' conduct of improperly describing the Engine as safe, usable, and defect-free. Plaintiff paid for a safe, usable, and defect-free engine but did not receive such product because the Engine contained a Defect which causes premature engine failure.

59. Upon information and belief, Defendants' actions were willful, wanton, and fraudulent.

60. Upon information and belief, officers, directors, or managing agents at Defendants authorized the use of the misleading statements about the Engines.

61. CLRA SECTION 1782 NOTICE. On July 10, 2017, Plaintiff, through counsel, sent a CLRA demand letter to Defendants that provided notice of Defendants' violation of the CLRA and demanded Defendants correct, repair, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein. The letter also stated that if Defendants refused to do so, Plaintiff would file a complaint seeking damages in accordance with the CLRA. Defendants failed to comply with the letter. For the foregoing reasons, pursuant to Civil Code section 1780(a)(3), Plaintiff seeks compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendants' acts and practices.

62. Pursuant to Civil Code sections 1780 and 1782, Plaintiff seeks damages in an amount to be proven at trial, an injunction to bar Defendants from continuing their deceptive practices, and reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION

## Violation Of The "Unlawful Prong" Of The UCL

63. Plaintiff incorporates by reference each preceding and succeeding paragraph as if fully set forth herein.

64. California's Unfair Competition Law prohibits any "unlawful, unfair, or fraudulent" business practice. Cal Bus. & Prof. Code § 17200. Defendants' marketing and sale of the Engines as safe, usable, and defect-free is "unlawful," "unfair," and "fraudulent."

65. A business practice is "unlawful" under the UCL if it violates any other law or regulation.

66. Defendants' conduct also violates various provisions of California's Consumer Legal Remedies Act, including Civil Code § 1770(a)(2), Civil Code § 1770(a)(5), Civil Code § 1770(a)(7), Civil Code § 1770(a)(9), and Civil Code § 1770(a)(16).

13
FIRST AMENDED COMPLAINT

67. As a result of the conduct described above, Defendants have been, and will continue to be, unjustly enriched at the expense of Plaintiff. Specifically, Defendants have been enriched by obtaining revenues and profits they would not otherwise have obtained absent their false, misleading, and deceptive practices.

68. Plaintiff seeks to enjoin further unlawful, unfair, and fraudulent acts and practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## THIRD CAUSE OF ACTION

### Violation of the "Unfair" Prong Of The UCL

69. Plaintiff incorporates by reference each preceding and succeeding paragraph as if fully set forth herein.

70. California's UCL prohibits any "unlawful, unfair, or fraudulent" business practice. Cal. Bus. & Prof. Code § 17200. Defendants' marketing and sale of the Engines as safe, usable, and defect-free is "unlawful," "unfair," and "fraudulent."

71. A business practice is "unfair" under the UCL if the gravity of the harm to the victim outweighs the utility of the defendant's conduct.

72. Defendants have violated, and continue to violate, the "unfair" prong of the UCL by luring consumers into buying the Engines by representing they are safe, usable, and defect-free, as discussed herein.

73. The gravity of the harm to Plaintiff resulting from these unfair acts and practices outweighs any conceivable utility of Defendants' conduct.

74. As a result of the conduct described above, Defendants have been, and will continue to be, unjustly enriched at the expense of Plaintiff. Specifically, Defendants have been enriched by obtaining revenues and profits they would not otherwise have obtained absent its false, misleading, and deceptive practices.

75. Plaintiff seeks to enjoin further unlawful, unfair, or fraudulent acts and

practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## FOURTH CAUSE OF ACTION
## VIOLATION OF "FRAUDULENT" PRONG OF THE UCL

76. Plaintiff incorporates by reference each preceding and succeeding paragraph as if fully set forth herein.

77. California's UCL prohibits any "unlawful, unfair, or fraudulent" business practice. Cal. Bus. & Prof. Code § 17200. Defendants' marketing and sale of the Engines as safe, usable, and defect-free is "unlawful," "unfair," and "fraudulent."

78. A fraudulent business practice is one in which members of the public are likely to be deceived.

79. Defendants have violated, and continue to violate, the "fraudulent" prong of the UCL by luring consumers into buying the Engines by representing safe, usable, and defect-free products, as discussed herein.

80. As a result of the conduct described above, Defendants have been, and will continue to be, unjustly enriched at the expense of Plaintiff. Specifically, Defendants have been enriched by obtaining revenues and profits they would not otherwise have obtained absent their false, misleading, and deceptive practices.

81. Plaintiff seeks to enjoin further unlawful, unfair, or fraudulent acts and practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## FIFTH CAUSE OF ACTION
## VIOLATION OF THE FAIR ADVERTISING LAW

82. Plaintiffs incorporates by reference each preceding and succeeding

paragraph as if fully set forth herein.

83. This cause of action is brought under California's Fair Advertising Law, California Business & Professions Code §§ 17500 et seq. ("FAL").

84. The FAL prohibits the dissemination of any advertising which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading. Cal. Bus. & Prof. Code § 17500.

85. Defendants represented, and continue to represent, that the Engines are safe, usable, and defect-free, which is untrue and misleading. The marketing and advertising is unfair, deceptive, and misleading within the meaning of California Business & Professions Code §§ 17500, et seq.

86. Plaintiff suffered injury in fact and a loss of money or property as a result of Defendants' acts and practices, which violate California Business & Professions Code §§ 17500, et seq.

## SIXTH CAUSE OF ACTION
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

87. Plaintiff incorporates by reference each preceding and succeeding paragraph as if fully set forth herein.

88. Defendants are each a "merchant" within the meaning of the Uniform Commercial Code ("UCC").

89. The Engines are "goods" as defined under the UCC.

90. With the sale of each Engines, Defendants impliedly warranted that the Engines were of merchantable quality.

91. The Engines are not of merchantable quality due to the Defect, which causes premature engine failure, posing an unreasonable risk to the pilot, passengers, and public safety, and potentially leading to thousands of dollars in repair expenses, costly and inconvenient maintenance, and risk of serious injury. Therefore, the Engines are not fit for their purpose of providing reliable and safe transportation.

16
FIRST AMENDED COMPLAINT

92. Defendants' attempt to limit the duration of the applicable warranty period is unconscionable. Among other things, Plaintiff had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Plaintiff, and Defendants knew that the Engines were defective at the time of sale and would fail well before their useful lives, yet chose to conceal that information, depriving Plaintiff of the ability to make an informed decision with respect to his purchase or lease decisions.

93. As a direct and proximate cause of Defendants' breach of implied warranty, Plaintiff bought an Engine he otherwise would not have, overpaid for his aircraft containing the engine, did not receive the benefit of his bargain, and the aircraft containing the Engine suffered a diminution in value.

## SEVENTH CAUSE OF ACTION
## COMMON LAW FRAUD

94. Plaintiff incorporates by reference each preceding and succeeding paragraph as if fully set forth herein.

95. Defendants made material omissions concerning a presently existing or past fact.

96. For example, Defendants did not fully and truthfully disclose to their customers the true nature of the inherent defect with the Engines, which was not readily discoverable until failure, or even after the warranty has expired. As a result, Plaintiff was fraudulently induced to purchase the Engine, with said Defect and all of the resultant problems.

97. These omissions were made by Defendants with knowledge of their falsity, and with the intent that Plaintiff and other consumers rely upon them.

98. Plaintiff reasonably relied upon these omissions and suffered damages as a result.

## EIGHTH CAUSE OF ACTION

17

FIRST AMENDED COMPLAINT

**Strict Product Liability**

99. Plaintiff incorporates by reference each preceding and succeeding paragraph as if fully set forth herein.

100. As discussed herein, the Engine Defendants manufactured, distributed, and sold to consumers like Plaintiff suffered from a manufacturing and design defect. As each Defendant is in the chain of commerce for the defective Engine, each Defendant is separately liable.

101. The defect in the Engine caused the Engine in Plaintiff's aircraft to fail mid-flight.

102. At the time the defect caused Plaintiff's crash, and at all times preceding the crash, Plaintiff used the Engine in an ordinary and reasonable way.

103. The Engine in Plaintiff' aircraft suffered from a design defect, in that it failed to perform as safely as an ordinary consumer would expect (or have a right to expect) when using the product in an intended or reasonably foreseeable manner.

104. Upon information and belief, Defendants knew of this defect, yet continued to market and sell the Engine as a safe product.

105. As a result of the defective design of the Engine, Plaintiff's Engine failed mid-flight, causing Plaintiff to suffer damages to his property, as well as extreme mental anguish caused by his near-death crash from the failed engine.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests this Court:

A. Award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiff is entitled;

B. Award pre-judgment and post-judgment interest on such monetary relief;

C. Grant appropriate injunctive or declaratory relief, including without limitation an Order that requires Defendants to repair, recall, or replace Engines and extend the applicable warranties to a reasonable period of time or, at a minimum, to

provide Plaintiff with appropriate curative notice regarding the existence and cause of the design Defect;

    D.    Award reasonable attorneys' fees and costs; and

    E.    Grant such further relief that this Court deems appropriate.

Dated: June 21, 2018

NYE, PEABODY, STIRLING, HALE & MILLER, LLP

By:    /s/
Jonathan D. Miller, Esq.
Alison M. Bernal, Esq.
Attorneys for Plaintiff, ROBERT PERRY

19

FIRST AMENDED COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiff, ROBERT PERRY, hereby demands a trial by jury of all claims so triable in the above-referenced matter.

Dated: June 21, 2018

NYE, PEABODY, STIRLING, HALE & MILLER, LLP

By: /s/
Jonathan D. Miller, Esq.
Alison M. Bernal, Esq.
Attorneys for Plaintiff, ROBERT PERRY